**THE UNITED STATES of America, Plaintiff,**

v.

**Mark CREW, Defendant.**

**No. 2:04–CR–154 TS.**

United States District Court,
D. Utah,
Central Division.

Nov. 19, 2004.

Vernon G. Stejskal, Drug Enforcement Administration, Metropolitan Narcotics Task Force, Salt Lake City, UT, for plaintiff.

David O. Leavitt, Salt Lake City, UT, for defendant.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

STEWART, District Judge.

This matter is before the court on Defendant's Motion to Suppress. Evidentiary hearing was held on July 13, 2004. Briefing was completed on September 28, 2004. There was some confusion as the completion of briefing, because in mid-October 2004, chambers received a message that a Reply brief would be filed shortly. However, no Reply has been filed and the court has proceeded to decision.

### FINDINGS OF FACT

In December 2003 and January 2004, Defendant Mark Crew was on parole with the state of Utah. His Parole Agreement provides:

2. ABSCONDING:

\*     \*     \*     \*     \*     \*

B. Residence: I will establish and reside at a residence of record and will not change my residence without first obtaining permission from my parole agent.

4. HOME VISITS: I will permit visits to my place of residence by agents of Adult Probation and Parole for the purpose of ensuring compliance with the conditions of my parole. I will not interfere with [this] requirement, *i.e.* having vicious dogs, perimeter security doors, refusing to open the door, etc.

5. SEARCHES: I will permit agents of Adult Probation and Parole to search my person, residence, vehicle

or any other property under my control, without a warrant, at any time, day or night, upon reasonable suspicion to ensure compliance with the conditions of my parole.

Pl.'s Ex. 1.

On December 5, 2003, Defendant was assigned to AP & P Agent DeLuca. On December 9, 2003, Agent DeLuca attempted to make supervision contact with Defendant at his reported residence. The Agent discovered that the address he had provided did not exist and the phone number he had provided was disconnected. On his next regularly scheduled reporting day, Defendant appeared and gave the Agent a new address and phone number.

On January 22, 2004, Agent DeLuca, accompanied by another AP & P Agent, was making contact visits with parolees. At approximately 7:20 p.m., they went to Defendant's address of record to make a routine home visit. The address Defendant had provided on December 9, 2003, was in a trailer park, space # 34. However, when they arrived, and knocked, no one answered. Agent DeLuca left a card in the door for Defendant. As they walked back to their car, they were approached by a woman. She asked them who they were looking for and they explained they were looking for Defendant. She told them that Defendant lived together with her and her husband across the street at trailer # 39. Agent DeLuca was quite concerned that Defendant had been released for some time and AP & P was unable to verify his residence, necessary information for supervising an individual in a community.

The Agents went to # 39, where the door was answered by John Gafa. Mr. Gafa owned and lived in trailer # 39. The Agents identified themselves as Defendant's parole officers and asked if he lived there. Mr. Gafa confirmed that Defendant lived at # 39, but stated that Defendant was not at home. Agent DeLuca explained that it was necessary for them to make sure he was living there and asked to see his bedroom.

Mr. Gafa initially would not consent. He asked them if they would wait for Defendant to come back to # 39. The Agents explained that if Defendant were living in # 39, that AP & P Agents must have access to his residence and to his place of employment to ensure compliance. Mr. Gafa indicated that he would like to call Defendant first. The Agents again explained that if a parolee was living there, they needed to come in, verify his residence and then would be on their way. One Agent also asked him if there was something wrong or a reason why they could not get into the residence. Mr. Gafa replied: "Because this is my house." The Agents again explained that if Defendant was living there, they had to have access to his residence. Mr. Gafa then said, "Yeah, go ahead, you guys can come on it."

Once inside trailer # 39, the Agents smelled a chemical smell. Mr. Gafa showed them Defendant's bedroom, where they performed a walk through, verified his residence by seeing his name on his toolbox, and left a card in his room and left the room.

Apparently the evidence at issue was discovered in the common area subsequent to their exit from Defendant's bedroom. Defendant does not assert that the discovery was a Fourth Amendment violation, if the Agents entry into the home were valid.

## DISCUSSION AND CONCLUSION

■ Defendant contends that the Agents' entry to the trailer was a violation of the Fourth Amendment because (1) the Agents did not have lawful consent to search the trailer; (2) despite their belief to the contrary, the Agents needed reasonable suspicion to enter the home, and (3)

the Agents did not have reasonable suspicion to enter the trailer.

The government contends that Mr. Gafa consented to the Agents' entry into the home and the search was lawfully based on the reasonable suspicion of a parole violation.

The Fourth Amendment provides protection from unreasonable searches and seizures. Generally, law enforcement officials should conduct searches pursuant to a warrant supported by probable cause. The Supreme Court, however, has recognized exceptions to the warrant requirement where " 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

\* \* \* \* \* \*

A state's parole system presents such "special needs." *See Griffin*, 483 U.S. at 873–74, 107 S.Ct. 3164 (applying "special needs" exception to probation system). Parolees do not enjoy "the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special parole restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). These restrictions are designed to ensure rehabilitation and protect the public. These twin aims justify the state limiting a parolee's Fourth Amendment rights and consequent expectations of privacy.

\* \* \* \* \* \*

We first conclude that the "special needs" of Utah's probation system justify a warrant exception in the parole context. The parole system is "a controlled passageway between prison and freedom." *State v. Velasquez*, 672 P.2d 1254 (Utah 1983). Parole Agents necessarily exercise close supervisory powers over their subjects to assure a successful transition. To adequately monitor a parolee's progress and deter further criminal conduct, a parole Agent must be permitted in the proper instance to act expeditiously and without warning. "[T]he delay inherent in obtaining a warrant would make it more difficult for ... officials to respond quickly to evidence of misconduct and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create." *Griffin*, 483 U.S. at 876, 107 S.Ct. 3164.

Further, we conclude that the prerequisites to a warrantless search of a parolee's residence in Utah comply with the Fourth Amendment's reasonableness requirement. The Utah Supreme Court has held a warrantless search of a parolee to be valid where the evidence establishes "(1) that the parole Agent has a reasonable suspicion that the parolee has committed a parole violation or crime, and (2) that the search is reasonably related to the parole Agent's duty." *State v. Johnson*, 748 P.2d 1069, 1072–73 (Utah 1987).

*U.S. v. Lewis*, 71 F.3d 358, 361–62 (10TH Cir.1995) (footnotes and citations omitted).

■ When the parolee, as a cohabitant of premises, gives consent to enter and to search, that consent is valid as to his personal space and all common space. *State v. Johnson*, 748 P.2d 1069, 1073–74 (Utah 1987), (warrantless search of common areas of parolee's apartment, which he shared with his mother, was lawful even though parolee's mother may not have consented to the search) *accord U.S. v. Cantley*, 130 F.3d 1371, 1377 (10th Cir.1997) (search pursuant to Oklahoma's probation manual).

In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the United States Supreme Court explained that consent to search can be

given not only by a defendant, but also by "a third party who possesse [s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171, 94 S.Ct. 988. Common authority to consent to a search rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. Thus, a showing of common authority requires "persuasive evidence of both shared use *and* joint access or control." *United States v. Salinas–Cano*, 959 F.2d 861, 864 (10th Cir.1992). When a probationer lives with a nonprobationer, the common authority rule pronounced in *Matlock* defines the permissible scope of a probation search. *See State v. Johnson*, 748 P.2d 1069, 1074 (Utah 1987) ("[T]he *Matlock* doctrine applies with equal force in parole cases."). In *Johnson*, the Utah Supreme Court explained: When a parolee lives with a nonparolee, courts generally hold that the cotenancy restricts, to some degree, the extent of a permissible consent search. The scope of consent impliedly given by a cotenant is limited to those parts of the premises where the tenants possess "common authority over or other sufficient relationship to the premises or effects sought to be inspected."

*Id.* at 1073 (quoting *Matlock*, 415 U.S. at 171, 94 S.Ct. 988).

Thus, by accepting the terms of his probation, [the parolee] consented to searches of any areas of the residence over which he had common authority with [cotenant], and the officers could premise their search of these areas on reasonable suspicion that [the parolee]

had violated a condition of his probation. This was a risk [the cotenant] assumed by living with ..., a probationer. The risk [the cotenant] assumed, however, was not unlimited. Because probation searches can be based on only a reasonable suspicion, probation searches where a probationer lives with a nonprobationer present considerable peril to the nonprobationer's Fourth Amendment rights.

\*　　\*　　\*　　\*　　\*　　\*

The risk to nonprobationers' Fourth Amendment rights demands that, when officers conduct a probation search where a probationer lives with a nonprobationer, the facts available to the officers must support a reasonable belief that the probationer has at least common authority over the area searched.... " The State bears the burden of proving common authority, and it must do so by a preponderance of the evidence." *State v. Brown*, 853 P.2d 851, 855 (Utah 1992).

*State v. Davis*, 965 P.2d 525, 532–33 (Utah App., 1998) (internal citations omitted).

In this case the facts available to the Agents supported their reasonable belief that the probationer has at least common authority over the area to be entered. The two other tenants told them that Defendant lived there.

Defendant had twice given his Parole Agent a false address. Whether the second such incident was intentional, or as he argues, as a result of giving her the trailer park's business card with the business address instead of his personal address does not matter. What does matter is that the Agent had twice gone to conduct a home visit to verify his whereabouts in the community and twice had not been able to do so.

The Parole Agreement required that as a condition of his release that Defendant

"establish and reside at a residence of record" and ... not change [his] residence without first obtaining permission from [his] parole Agent. The "reasonable suspicion" standard is triggered by suspicions of violations of the conditions of parole. Thus, there does not also have to be a reasonable suspicion of a violation of the law. Defendant had twice failed to comply with a condition of parole. Such failure made it impossible for the Agent to determine Defendants whereabouts or ensure compliance with any of the other conditions of his parole. In this circumstances, it was reasonable, prudent and necessary for the Agent to take immediate action to verify his whereabouts. The court finds and concludes that the Agents had a reasonable suspicion of a violation of Defendant's parole when his parole Agent had twice, in six weeks, been unable to verify that he had established and resided at and not changed, residency without permission. The Agents had a reasonable suspicion that Defendant had violated the conditions of his release by "absconding" as it is defined in his Parole Agreement. Because they had such reasonable suspicion of a violation of the terms of his conditions of parole, Defendant had given consent to search his residence.

Thus, when the Agents told Mr. Gafa that if Defendant were living in # 39, that they must have access to his residence to ensure compliance, they were not, as Defendant argues, acting under a mistaken assertion of legal authority. They were acting under the assertion of actual authority because Defendant had given authority for home visits to verify his residency and permission to search his residence upon reasonable suspicion.[1] Where Defendant had given written permission for home visits and searches under reasonable suspicion, that permission was valid whether or not he was there to consent. *State v. Martinez*, 811 P.2d 205, 209 (Utah App.1991) (to require that a parolee "must be present to give active consent to search would nullify such provisions in probation agreements, making such provisions merely agreements to agree.") (internal quotations omitted).

Under *Davis* and *Johnson, supra*, the scope of Defendant's consent to search covers the common areas of the residence as well as his bedroom. The right to search his bedroom for indicia of residence is the right the Agents asserted. When informed of this right, the cotenant, Mr. Gafa, eventually consented to their entry. The court finds that this consent was valid.

The court also finds and concludes that the Agents' search, a quick look in the bedroom for indicia of residence, was reasonably related to the Agent's duty to supervise Defendant while he was released in the community.

The court need not address the scope of the common area of trailer # 39, because it is uncontroverted that Mr. Gafa showed the Agents directly to Defendant's bedroom.

Based on the foregoing, the court finds and concludes that there was consent to entry into the house by the co-tenant and that the Agents had reasonable suspicion of a violation of Defendant's condition of probation that supported a search. It is therefore

ORDERED that Defendant's Motion to Dismiss is Denied. It is further

ORDERED that the time from the filing of the Motion to Suppress through the

---

**1.** There is a common sense distinction between visits and searches: searches are an intrusive, probing endeavor, while home visits are much more restricted in scope. *U.S. v. Newton*, 181 F.Supp.2d 157, 161 (E.D.N.Y.2002)(internal quotations and citations omitted).

date of the entry of this Order is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F)(co-defendant Delbert McKellips' separate Motion to Suppress remains pending) and (J).