*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0450p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 04-6382

ANTONIO R. HENRY,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 03-00109—Edward H. Johnstone, District Judge.

Argued: September 19, 2005

Decided and Filed: November 22, 2005

Before: DAUGHTREY and MOORE, Circuit Judges; ALDRICH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Elgin L. Crull, CRULL & CRULL, Louisville, Kentucky, for Appellant. Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Elgin L. Crull, CRULL & CRULL, Louisville, Kentucky, for Appellant. Terry M. Cushing, Brian Butler, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Antonio R. Henry ("Henry") appeals his conviction for possession of ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Henry argues that the district court erred first by denying his motion to suppress evidence obtained during a probation officer's search of a bag found at his residence and then by treating the United States Sentencing Guidelines as mandatory while sentencing him. Henry also contends for the first time on appeal that § 922(g)(1) exceeds Congress's power under the Commerce Clause.

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

Because the probation search was founded upon neither reasonable suspicion nor consent, we **REVERSE** the district court's denial of Henry's motion to suppress and **VACATE** Henry's conviction and sentence. This result makes it unnecessary for us to reach the sentencing issue. Finally, we reject Henry's commerce-power argument.

## I. BACKGROUND

On October 8, 2003, Henry was discharged from a Kentucky prison pursuant to a grant of shock probation. *See* KY. REV. STAT. ANN. § 439.265. The following day, Henry reported to Probation Officer Michael Havens ("Officer Havens") for the first time. At that meeting, Henry filled out a releasee's report, indicating that he was unemployed, received SSI payments, and resided at 2821 Northwestern Parkway. A condition of Henry's probation forbade Henry either to change the residence listed on this report without the approval of his probation officer or to have more than one residence at a time. Joint Appendix ("J.A.") at 53 (Conditions of Supervision ¶ VI.D). Henry also was required either to maintain full-time employment or to seek employment when unemployed. J.A. at 51 (Order on Motion for Shock Probation ¶ 8), 53 (Conditions of Supervision ¶¶ VI.B, VII.A.4).

Subsequent to the initial meeting on October 9, 2003, Officer Havens made three visits to 2821 Northwestern Parkway in order to verify that Henry resided there. On October 13, 2003, Officer Havens made two visits to the reported address: the first in the morning and the second in the afternoon.[1] On October 20, 2003, Officer Havens made one visit at some time between 8:00 A.M. and 4:30 P.M., but he could not recall a more precise time. On each occasion, nobody answered Officer Havens's knocks on the front and back doors, and Officer Havens observed no movement or noise. Officer Havens made no other efforts to verify Henry's residence: Officer Havens made no attempt to reach Henry at his reported phone number, either before or after his home visits, and he did not ask any neighbors whether Henry lived at the residence. Officer Havens testified that, in his experience, it is "relatively common" for probationers to live somewhere other than the addresses they report, and he concluded that Henry "probably didn't live at that address." J.A. at 80-81 (Suppression Hr'g Tr. at 8-9) (Havens Test.).

On October 22, 2003, Henry made his next scheduled report to Officer Havens. At that meeting, Henry filled out another releasee's report and once again indicated that he was unemployed, received SSI payments, and resided at 2821 Northwestern Parkway. Officer Havens informed Henry that he was going to send two officers home with Henry in order to verify his residence. Officer Havens testified that upon hearing this news, Henry "acted very erratic, very nervous." J.A. at 83 (Suppression Hr'g Tr. at 11) (Havens Test.).

At Officer Havens's request, Probation Officers Melanie McClish ("Officer McClish") and Christopher Tally ("Officer Tally") went with Henry to 2821 Northwestern Parkway in order to verify that Henry lived there. Henry let the officers in, but neither officer recalled whether Henry had a key to the house. While Officer Tally remained downstairs with Henry, Officer McClish went upstairs to examine Henry's room.

---

[1]The district court appears to have credited Officer Havens's initial assertion on direct examination, J.A. at 80 (Suppression Hr'g Tr. at 8) (Havens Test.), that his second visit of October 13, 2003, was in the evening. J.A. at 69 (Mem. & Order at 2). This finding was clearly erroneous, because on both cross-examination and redirect examination, Officer Havens clarified that his second visit was in the afternoon. J.A. at 89 (stating that his second visit on "the 20th of October" — the context makes it clear that he actually was referring to the 13th — was "in the afternoon"), 95 (answering that he "went once in the morning and once in the afternoon" when asked to state to "the best of [his] recollection" when he went on October 13th) (Suppression Hr'g Tr. at 19, 27) (Havens Test.). In any event, at oral argument the government conceded that the second visit was in the afternoon.

Officer McClish saw that the room that Henry claimed was his had a dresser and was "cluttered with clothes," but it did not have a bed. J.A. at 101 (Suppression Hr'g Tr. at 33) (McClish Test.). Officer McClish had the impression that the room "just didn't look like it was occupied." *Id.* Officer McClish began looking in the room for items — such as "[c]lothes, pictures, . . . deod[o]rant" — indicating that Henry lived there. *Id.* Officer McClish saw a gym bag in an open closet; she picked the bag up, noticing that it was very heavy. Officer McClish opened the bag and found in it a firearm and ammunition.[2]

Henry was indicted for possession of ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Henry made a motion to suppress the ammunition, arguing that the officers had neither reasonable suspicion nor consent to conduct the search. The district court denied Henry's motion, holding that the officers had reasonable suspicion to conduct the search. The district court did not address the consent issue.

A jury found Henry guilty. At sentencing, the district court found that Henry was an armed career criminal who possessed ammunition in connection with a crime of violence. Relying on *Blakely v. Washington*, 542 U.S. 296 (2004), Henry objected to his sentence under the Sixth Amendment. The district court overruled Henry's objection and sentenced Henry to 280 months' imprisonment, pursuant to the then-mandatory United States Sentencing Guidelines. Henry now appeals.

## II. ANALYSIS

### A. Motion to Suppress

Henry argues that the district court should have granted his motion to suppress because (1) the officers lacked reasonable suspicion to search the bag containing the ammunition and (2) he did not consent to the search.[3]

#### 1. Standard of Review

"'When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo.'" *United States v. Oliver*, 397 F.3d 369, 374 (6th Cir. 2005) (quoting *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000)). "'A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)).

#### 2. Probationary Search

The Supreme Court first addressed the constitutionality of the search of a probationer's home in *Griffin v. Wisconsin*, 483 U.S. 868 (1987). At issue in *Griffin* was the warrantless search of a probationer's apartment conducted by probation officers upon receiving information from a police

---

[2]It was later discovered that the firearm was not real.

[3]We need not address at length Henry's third argument for suppressing the ammunition — that the search violated the Fourth Amendment because it was not executed in accordance with state regulations. We have explained that state law has no independent significance in determining whether the Fourth Amendment has been violated. *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir.) ("[T]he appropriate inquiry for a federal court considering a motion to suppress evidence seized by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment. The fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended."), *cert. denied*, 512 U.S. 1243 (1994).

detective that "there were or might be guns" there. *Id.* at 870, 871. The search was conducted pursuant to a Wisconsin probation regulation that permitted a probation officer to perform a warrantless search of a probationer's home "as long as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband."[4] *Id.* at 870-71. Accepting as given the Wisconsin Supreme Court's determination that the detective's tip constituted "reasonable grounds" under the regulation, the Court upheld the regulation because "the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable grounds.'" *Id.* at 875-76. The Court then upheld the search itself as "'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880.[5]

When analyzing the validity of a probationary search under the Fourth Amendment, we follow the Court's example by applying its "two-pronged inquiry." *United States v. Loney*, 331 F.3d 516, 520 (6th Cir. 2003). "First, [we] examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement. If so, [we] then analyze whether the facts of the search itself satisfy the regulation or statute at issue." *Id.* (citations omitted).

### a. The Kentucky Search Policy

Applying the two-step *Griffin* analysis to the instant case, the first question is whether the Kentucky search policy that authorized the complained-of search is reasonable under the Fourth Amendment. Pursuant to statutory authority, KY. REV. STAT. ANN. §§ 196.030, 196.035, 439.438, 439.470, the Kentucky Department of Corrections promulgated a policy "[t]o establish guidelines for Probation and Parole Officers . . . relating to search and seizure" and other issues. J.A. at 56 (KENTUCKY CORRECTIONS POLICIES AND PROCEDURES 27-16-01 (issued May 14, 2001) [hereinafter CORRECTIONS POLICIES], *incorporated by reference in* 501 KY. ADMIN. REGS. 6:020 (2003)). As interpreted by the Kentucky Supreme Court, the policy provides that an officer may conduct a warrantless search if he has "reasonable suspicion 'that the performance of the search may produce evidence to support [an alleged violation of Appellant's parole].'" *Coleman v. Commonwealth*, 100 S.W.3d 745, 754 (Ky. 2002) (alteration in original).

We assessed an earlier version of this policy in *United States v. Payne*, 181 F.3d 781 (6th Cir. 1999). At the time, "[u]nlike the Supreme Court in *Griffin*, we [were] without the benefit of a state court's interpretation" of the policy's standard, so we conducted our own interpretation of the policy. *Id.* at 786. Based on the policy's definition of reasonable suspicion, we observed that the policy "appears to adopt the federal definition of reasonable suspicion," *id.*, "a standard . . . at least as demanding as the standard upheld in *Griffin*," *id.* at 787. Therefore, we held the policy to be reasonable under the Fourth Amendment. The policy we review today retains in substance the same definition of reasonable suspicion we discussed in *Payne*, so the reasonable-suspicion aspect of the policy remains reasonable under the Fourth Amendment.

---

[4]The regulation also set out "a variety of factors" that an officer "should consider . . . in determining whether 'reasonable grounds' exist." *Griffin*, 483 U.S. at 871.

[5]The Court revisited the issue of warrantless searches of probationers' residences, in the context of investigatory rather than probationary purposes, in *United States v. Knights*, 534 U.S. 112 (2001). The Court upheld a search that was supported by reasonable suspicion and authorized by a search condition that was not limited to probationary searches. *Id.* at 116, 122. Because the search of Henry's residence was conducted for a probationary purpose — to verify that he was not violating the residency condition of his probation — we apply *Griffin* instead of *Knights*. In any event, as we discuss below, when we apply *Griffin* to Kentucky's probation search policy, we are left with the same standard enunciated in *Knights*: reasonable suspicion.

We cannot simply rely on *Payne* to conclude that the whole policy is reasonable, however, because another part of the policy has been modified to make its scope broader. While the policy in *Payne* provided for a warrantless search "upon reasonable suspicion that the [probationer] is in possession of contraband,"[6] 181 F.3d at 786, the new policy permits a warrantless search upon reasonable suspicion that the probationer has violated *any* condition of probation. We upheld a similarly broad search policy in *Loney*, where an Ohio statute authorized the warrantless search of a parolee "if a supervising officer has 'reasonable grounds' to believe . . . that a parolee 'is not complying with the terms and conditions . . . of parole.'" 331 F.3d at 521 (quoting OHIO REV. CODE ANN. § 2967.131(C)) (second omission in original). Just as the statute in *Loney* was not limited to searches for contraband and instead extended to searches for any parole violation, the search policy here permits searches for any probation violation. In light of *Loney*, then, the breadth of the Kentucky search policy is reasonable.

Because Kentucky's probationary search policy incorporates both the quantum of evidence (i.e., reasonable suspicion) approved in *Payne* and the breadth (i.e., not just contraband but any probation violation) approved in *Loney*, we hold that the policy is reasonable under the Fourth Amendment.

### b. The Search Itself

Having determined that the Kentucky search policy is reasonable, we turn now to the second step of the *Griffin* inquiry: whether the complained-of search conformed with the regulations, i.e., whether there was reasonable suspicion to conduct the search.[7] "Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *Payne*, 181 F.3d at 788 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The government argues that Officer Havens had reasonable suspicion that Henry did not live at his reported residence, in violation of a probation condition. It appears that we have never squarely determined whether a given set of facts constituted reasonable suspicion that a defendant had violated a residency condition of his probation.[8] Indeed, the question has arisen exceedingly rarely, with only a few cases from other jurisdictions addressing the issue. In light of this dearth of precedent, we review the facts of each of these persuasive authorities in detail.

In *People v. Lampitok*, 798 N.E.2d 91 (Ill. 2003), the defendant's fiancee was subject to the following probation condition: "[T]he [probationer] shall keep her Probation Officer advised of her place of residence and employment at all times, advising the Probation Officer prior to any change

---

[6]The Wisconsin regulation upheld in *Griffin* also was limited to searches for contraband. 483 U.S. at 870-71.

[7]In *Payne*, we suggested a third step in the analysis. If a search is "not authorized by the regulatory scheme," it is "unreasonable unless it independently satisfies traditional Fourth Amendment requirements." 181 F.3d at 787-88. "[A]t minimum . . . a [probation] search conducted without statutory authorization [must] meet the federal standard of reasonable suspicion." *Id.* at 788. Because the Kentucky policy already requires reasonable suspicion, however, in this case the third step collapses into the second.

[8]We addressed a related issue in *United States v. Carnes*, 309 F.3d 950 (6th Cir. 2002), *cert. denied*, 537 U.S. 1240 (2003). The government argued that it had seized and listened to audio tapes discovered at the defendant-parolee's residence in order to establish a residency-condition violation. *Id.* at 960. We noted, however, that the government did not listen to the tapes until three months later — after the parole-violation hearing. *Id.* at 959. We held that the tapes should have been suppressed, because "there [was] no evidence that the officers . . . were motivated by a desire to establish a violation of the residency requirement . . . . Rather, the government's failure to listen to the tapes until well after the parole hearing suggests some other motivation." *Id.* at 961. *Carnes* is not directly on point here because we did not consider whether there would have been adequate evidence to justify the search absent the improper motive. Nor is there is any indication of an improper motive in the instant case.

of residence or employment." *Id.* at 96. The fiancee had reported to her probation officer that she resided in an apartment with relatives and other roommates. During a home visit to the apartment, the fiancee's probation officer was told by two relatives that the fiancee no longer lived there and instead was staying with the defendant at a certain motel. Officers went to the motel, where an employee directed them to a specific room when asked where the fiancee was staying. The defendant was in the hotel room, and he told the probation officer that his fiancee had been staying in the room with him. The Illinois Supreme Court held that the officers had reasonable suspicion that the fiancee had changed residences without prior notification, in violation of her probation. *Id.* at 109. The court highlighted several facts supporting a finding of reasonable suspicion: (i) the initial information came from people who were the probationer's relatives and roommates; (ii) the relatives gave the specific name of the motel where the probationer was staying, (iii) the information was corroborated by the motel clerk, and (iv) the information was corroborated by the defendant. *Id.* at 108-09.

In *United States v. Dally*, 606 F.2d 861 (9th Cir. 1979), one defendant was subject to a parole condition requiring him to obtain permission from his parole officer before changing his address and promptly to notify his parole officer of an emergency move. *Id.* at 862. On January 30, the parole officer was unable to find the parolee at his reported residence, so he left a message with the parolee's nephew asking the parolee to get in touch with him. On February 2, ATF agents saw the parolee at the co-defendant's apartment; he was taking out the garbage, bringing in laundry, and talking to neighbors. On February 6, the parole officer received this information from a state special agent, reported that the parolee had not returned his message, and asked the special agent to conduct a parole search if the parolee had a new residence. On the morning of February 8, ATF agents saw the parolee's car near the co-defendant's apartment; the car's windows were fogged, suggesting that the car had been there overnight. On February 9, ATF agents saw the parolee come out of the co-defendant's apartment in the morning; drive away in a car that had been parked overnight; return with dry cleaning; change his clothes and leave the apartment with laundry; return again with more dry cleaning, and use a key to open the door. The Ninth Circuit upheld the search because officers' observations supported a "reasonable belief" that the parolee had another residence, in violation of his parole.[9] *Id.* at 863.

In *United States v. Crew*, 345 F. Supp. 2d 1264 (D. Utah 2004), the defendant was subject to the following parole condition: "I will establish and reside at a residence of record and will not change my residence without first obtaining permission from my parole agent." *Id.* at 1264. On December 9, the parole officer attempted to contact the defendant at his residence, but the reported address did not exist and the reported phone number was disconnected. The next time he reported to the parole officer, the defendant provided a new address and phone number. On January 22, parole officers visited the defendant's newly-reported address; when nobody answered their knock, they left a card in the door for the defendant. On their way back to their car, they asked a woman about the defendant, and she told them that he lived with her and her husband in a neighboring trailer. The man who answered the door at that trailer confirmed that the defendant lived there. The court held that these facts constituted reasonable suspicion that the defendant had violated the residency condition. *Id.* at 1268.

In each case, there were articulable, particularized facts supporting the officers' reasonable suspicion that the defendant had violated his residency condition. First, there was evidence that the defendant was living at some unreported address. This evidence was in the form of either the statements of people who lived with the defendant at the unreported address, as in *Lampitok* and *Crew*, or from officers' observations of the defendant at the unreported address engaging in activities

---

[9]The Ninth Circuit has since characterized *Dally* as invoking the reasonable suspicion standard. *Moreno v. Baca*, 400 F.3d 1152, 1163 (9th Cir. 2005).

indicating that he lived there, as in *Dally*. In contrast, here there was absolutely *no* evidence that Henry lived at some unreported address.

Second, in each case above there was evidence that the defendant was no longer living at his reported address. This evidence was in the form of the statements of people who had lived with the defendant at the reported address in *Lampitok*, the defendant's failure to respond to a phone message left with a relative in *Dally*, or the defendant not being at home during an unannounced visit *after he had already falsely reported* his address and phone number on a prior occasion in *Crew*.

In the case at bar, the government relies on the following facts as evidence that Henry did not live at his reported address: (1) Henry was not present during the three times that Officer Havens visited Henry's reported address; (2) Henry was unemployed and received SSI payments; (3) in Officer Havens's experience, it is common for a probationer not to live at the address he reports to his probation officer; and (4) Henry appeared nervous when Officer Havens informed him that two probation officers would accompany him home to verify his residence. For the reasons discussed below, these facts and the inferences that Officer Havens drew from them are inadequate to constitute reasonable suspicion that Henry no longer lived at his reported residence.

First, Officer Havens inferred from the fact that he received no response during his three home visits that Henry was not home at those times. But it "is not necessarily true" that someone is not at home when he or she does not answer the door; Henry "may have simply not answered the door." *United States v. Sundiata*, 3 F. Supp. 2d 682, 687 n.9 (E.D. Va. 1998). There are numerous reasons why someone may not answer a knock at the door. For example, Henry might have been sleeping, showering, or simply sitting in a room from which Officer Havens's knocks were inaudible. Unlike the officers in *Dally* and *Crew*, Officer Havens made no attempt to reach Henry at his reported phone number, either before or after his home visits. Nor did Officer Havens ask a neighbor whether Henry lived at the residence, as the officers did in *Crew*. Indeed, Officer Havens made no investigation other than the home visits themselves.

Second, even though Henry was required either to maintain full-time employment or to seek employment when unemployed, Officer Havens inferred from the fact that Henry was unemployed and received SSI payments that he should have been at home during the day. Officer Havens testified, however, that Henry had not yet provided verification of his SSI status, and that only upon providing such documentation would Havens ask the state court to relieve Henry of the employment conditions. When Henry indicated at his first meeting with Officer Havens that he was unemployed and receiving SSI payments, Officer Havens presumably informed Henry — as any conscientious probation officer would do — that Henry would continue to be bound by the employment conditions. Therefore, one would reasonably expect Henry to be away from his residence during the day either to work or to seek work. Yet Officer Havens expected Henry to be at home when Havens visited Henry's residence during the day. We refuse to let Officer Havens have it both ways.

Moreover, Officer Havens's inference fails to appreciate that there are any number of reasons — other than to work or to find work — why Henry might have been out of the house, such as to shop for groceries, to see a doctor, or to visit with friends. Indeed, Henry could have been attempting to comply with his probation order's mandate to obtain a GED, J.A. at 51 (Order on Motion for Shock Probation ¶ 7), by attending classes during the day. Officer Havens's inference is especially suspect in light of his testimony that the probation conditions neither limited when Henry could leave his residence, J.A. at 86, 90 (Suppression Hr'g Tr. at 16, 20) (Havens Test.), nor required that he be home when a probation officer planned an unannounced home visit, J.A. at 88, 90 (Suppression Hr'g Tr. at 18, 20) (Havens Test.). Indeed, the probation conditions did not even place Henry under a curfew condition. J.A. at 52 (Conditions of Supervision ¶ II.A), 86 (Suppression Hr'g Tr. at 16) (Havens Test.). If Henry was free to leave the house at night, why would he be less free to leave the house during the day? In light of all these possibilities, one

wonders why Officer Havens did not leave any indication that he had been trying to reach Henry, as the officers reasonably did in *Dally* (by leaving a phone message with a relative) and *Crew* (by leaving a card at the door).

Officer Havens's third inference — that, based on his experience of having other probationers lie about their residences, Henry probably was lying, too — is not suspect in and of itself. An officer may make a reasonable suspicion determination "based on the reasonable inferences he may draw 'in light of his experience.'" *United States v. Foster*, 376 F.3d 577, 586 (6th Cir.) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)), *cert. denied*, — U.S. —, 125 S. Ct. 635 (2004). What is problematic, however, is that this experiential inference depended on the reliability of the prior two inferences, which were faulty for the reasons discussed above.

Finally, the government offers Henry's nervousness upon being told that two probation officers would accompany him home to verify his residence, presumably because it bolsters all of Officer Havens's inferences. "[N]ervousness has been considered in finding reasonable suspicion in conjunction with other factors." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (citing *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). Nervousness is, however, "an unreliable indicator," as "[m]any citizens become nervous . . . , even when they have nothing to hide or fear." *Id.* at 630-31; *see also United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997) ("It is certainly not uncommon for most citizens — whether innocent or guilty — to exhibit signs of nervousness when confronted by a law enforcement officer."). Therefore, we have repeatedly discounted the value of nervousness in the reasonable-suspicion calculus. *See, e.g.*, *Richardson*, 385 F.3d at 630-31; *Joshua v. DeWitt*, 341 F.3d 430, 445 (6th Cir. 2003); *United States v. Smith*, 263 F.3d 571, 591 (6th Cir. 2001); *Mesa*, 62 F.3d at 163; *United States v. Grant*, 920 F.2d 376, 386 (6th Cir. 1991); *United States v. Andrews*, 600 F.2d 563, 566 (6th Cir.), *cert. denied*, 444 U.S. 878 (1979). In light of the unreliability of nervousness, we have explained that while "nervous, evasive behavior" can justify reasonable suspicion,[10] *Joshua*, 341 F.3d at 445 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)), mere "nervousness or restlessness" cannot, *id. See also Mesa*, 62 F.3d at 162 ("[N]ervousness is . . . not a ground sufficient in and of itself."). Here, although Officer Havens testified that Henry appeared nervous, there has been no suggestion that Henry engaged in any evasive behavior in conjunction with his nervousness. On the contrary, the government — in support of its consent argument — points to the officers' testimony that Henry consented to having the officers visit his house by letting them in. This evidence elides any serious suggestion that Henry acted evasively. Without evidence of evasive behavior, we give little, if any, weight in the reasonable-suspicion analysis to Henry's nervousness.

Because the government has pointed not to "articulable reasons" and "a particularized and objective basis" that Henry violated the residency condition of his probation but instead to a chain

---

[10]The Supreme Court said in *Illinois v. Wardlow*, 528 U.S. 119 (2000), that "nervous, *evasive* behavior is a pertinent factor in determining reasonable suspicion." *Id.* at 124 (emphasis added). We concluded in *Joshua* that evasion is a critical component of "nervous, evasive behavior" because the *Wardlow* Court "cited several of its decisions involving evasive efforts to escape detection at the Mexico border and airports." *Joshua*, 341 F.3d at 444 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) ("The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) ("The three confederates . . . had spoken furtively to one another. One was twice overheard urging the others to 'get out of here.' Respondent's strange movements in his attempt to evade the officers aroused further justifiable suspicion . . . ."); *United States v. Sokolow*, 490 U.S. 1, 5, 8-9 (1989) (noting that "[Respondent] appeared to be very nervous and was looking all around the waiting area," but that "one taking an evasive path through an airport might be seeking to avoid a confrontation with an angry acquaintance or with a creditor")).

Also supporting our conclusion in *Joshua* is the fact that *Wardlow* itself involved evasion rather than mere nervousness. *See* 528 U.S. at 124 ("[I]t was not merely respondent's presence . . . that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. . . . Headlong flight — wherever it occurs — is the consummate act of evasion . . . ."). Furthermore, the Court used the phrase "nervous, evasive behavior" rather than "nervous *or* evasive behavior."

of tenuous inferences, we hold that the officers did not have the requisite reasonable suspicion to conduct the search. Having failed the second step of the *Griffin* probationary-search analysis, the search was unreasonable under the Fourth Amendment.

### 3. Consent

The government argues that even if it did not have reasonable suspicion to conduct the challenged search, Henry consented to it by agreeing to probation conditions that included a search provision. The Supreme Court has explicitly declined to address whether a probationer consents to suspicionless searches by agreeing to a search condition.[11] *United States v. Knights*, 534 U.S. 112, 118, 120 n.6 (2001). Although other circuits have addressed the issue,[12] it remains an open question in this circuit.[13] We need not decide this thorny issue today, however, because even if Henry could consent to searches by agreeing to his search condition, the complained-of search was not encompassed by the condition and therefore would not have been included in the consent. The provision in Henry's probation order permitted searches when Henry's probation officer "ha[d] reason to believe" that Henry had "illegal drugs, alcohol, volatile substance, or other contraband on [his] person or property," J.A. at 52 (Conditions of Supervision ¶ V.A). Henry's putative consent would therefore extend only to contraband searches. Officers Havens and McClish testified, however, that they had *no* reason to believe that Henry possessed such items, establishing that the instant search was *not* a contraband search and therefore was beyond Henry's theoretical consent. Moreover, no other condition provided for searches upon belief of a suspected residency violation, the claimed reason for the instant search.[14] Because the search was not conducted for the limited reason set out in the search condition, and no other condition provided for searches pursuant to the government's asserted reason for the search (i.e., a suspected residency violation), Henry did not consent to the search by agreeing to the conditions of his probation — even if such consent were possible.

The government argues in the alternative that even if Henry did not give a blanket consent by agreeing to his probation conditions, he specifically consented to the instant search itself via his

---

[11]The Court instead considered the condition to be "a salient circumstance" in determining whether the reasonable-suspicion-based investigatory search of a probationer's residence was reasonable. *Knights*, 534 U.S. at 118.

[12]The diversity of approaches reflects the difficulty of the issue. The Seventh Circuit has held that a probationer's agreement to terms of probation that include a broad search condition constitutes effective consent. *United States v. Barnett*, 415 F.3d 690, 691-92 (7th Cir. 2005). A panel of the Ninth Circuit reached the opposite conclusion with respect to parolees, *United States v. Crawford*, 323 F.3d 700, 717-19 (9th Cir. 2003), but the en banc court vacated the decision and declined to reach the issue, *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004), *cert. denied*, — U.S. —, 125 S. Ct. 863 (2005). In a pre-*Knights* case, the First Circuit did not reach the consent issue but "observe[d] . . . that a question of coercion would arise as to any contention that 'agreement' to a probation search condition constitutes a general consent to search." *United States v. Giannetta*, 909 F.2d 571, 576 n.4 (1st Cir. 1990). Finally, although it did not expressly rely on a consent theory, the Second Circuit has held that a home visit of a federal supervised releasee is not subject to a reasonable-suspicion requirement because of the combination of the releasee's awareness of a broad home-visit condition and the less intrusive nature of a home visit relative to a full search. *United States v. Reyes*, 283 F.3d 446, 462 (2d Cir. 2002).

[13]This court has addressed the issue only by unpublished opinion. *See United States v. Downs*, No. 96-3862, 1999 WL 130786, at *2, *4 (6th Cir. Jan. 19, 1999) (unpublished opinion) (holding a probationer's agreement to "search without warrant of my person, my motor vehicle, or my place of residence by a probation/parole officer at any time" to constitute a valid Fourth Amendment waiver).

[14]It is the state corrections policies and procedures manual — not the probation conditions — that provides for searches not just for contraband possession but also for other probation violations, which presumably would include a residency violation. *See* J.A. at 57-58 (CORRECTIONS POLICIES 27-16-01 ¶ VI.(1)). There is no evidence, however, that Henry agreed to or even saw this manual.

words and conduct.  Officer McClish testified that Henry did *not* expressly consent to a search of the bag, so the government's logic is that Henry consented to the search by consenting to the home visit.  The government cites as support for the purported verbal consent Officer McClish's testimony that "[w]e did consent with him beforehand."  J.A. at 107 (Suppression Hr'g Tr. at 39) (McClish Test.).  As evidence that Henry consented to the search through his conduct, both officers testified that he let the officers into the residence.  Because it upheld the search on the basis of reasonable suspicion, the district court did not reach the consent issue.  We need not remand the case, however, because even if we take as true the government's factual allegations that Henry consented to a home visit,[15] as a matter of law the scope of Henry's consent did not include the search of his bag.[16]  *See United States v. Jenkins*, 92 F.3d 430, 436-38 (6th Cir. 1996) (declining to remand to the district court and instead holding that even if the defendant's allegations were taken as true, the consent was valid), *cert. denied*, 520 U.S. 1170 (1997).

"When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search."  *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir.), *cert. denied*, — U.S. —, 124 S. Ct. 2926 (2004).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  "The scope of a search is generally defined by its expressed object."  *Id.*  In *Jimeno,* where the defendant gave the officer permission to search his car, the officer had told the defendant that he would be looking for drugs.  Because "[a] reasonable person may be expected to know that narcotics are generally carried in some form of a container," the Court concluded that "it was objectively reasonable for the police to conclude that the general consent to search respondents' car included consent to search containers within that car which might bear drugs."[17]  *Id.*  Based on the expressed-object analysis, one might expect that because Officer McClish was looking for, among other things, Henry's personal belongings, it was objectively reasonable to conclude that Henry's consent extended to the bag.

There are, however, two important reasons not to hew blindly to the expressed-object approach in this setting.  First, in a search for evidence that a probationer genuinely lives at his reported address, there is no identifiable "expressed object."  This problem is demonstrated amply by the instant case.  Officer McClish testified that she was looking for "[a]nything" to indicate that Henry lived at his reported residence.  J.A. at 101 (Suppression Hr'g Tr. at 33) (McClish Test.).  She

---

[15]Therefore, we need not consider the contradictions and holes in the officers' testimony, such as Officer Tally's testimony that Henry did not give verbal consent and the officers' failure to recall a fact as basic as whether Henry had a key to the house.

[16]Nor can the government complain that we must remand in order to permit it to put forth more facts on the consent issue.  In his motion to suppress, Henry argued that the search was nonconsensual, J.A. at 28 (Mot. and Mem. to Suppress ¶ 4), and both parties elicited testimony relevant to the consent issue at the suppression hearing.  "When, as here, it is alleged that the defendant consented to the search, '[i]t is the Government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained."  *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (alteration in original) (quoting *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir.1996)).

[17]We have applied the expressed-object principle to hold that consent to search a vehicle for contraband like drugs or stolen goods encompasses the vehicle's gas tank.  *Garrido-Santana*, 360 F.3d at 576.  We also have held that consent to search a bag extends to closed containers in the bag, even when the searching officer does *not* express the object of the search.  *United States v. Gant*, 112 F.3d 239, 243 (6th Cir. 1997).  This seeming inconsistency can be resolved, however, based on our observation that "the luggage of a typical traveler is likely to include numerous containers."  *Id.*  Presumably, then, it is objectively reasonable for a traveler to be aware that the object of a search is as likely to be in a container as it is loose in the bag.

listed clothes, photographs, and deodorant as examples but also noted that his bedroom did not have a bed in it. The great variety in size, shape, and typical location of just these four items illustrates the far-reaching search that would be authorized if we were to peg the scope of consent simply to the object of the search. Every time a probationer permitted an officer to enter his home in connection with a search for proof that he lived there, he would be subjecting to search every space, paper, and container in his home. We think it plain that no reasonable person would understand a probationer's consent to extend so far simply by letting officers visit his home to look for signs of residence. The fact that the expressed-object analysis seemingly mandates this absurd result demonstrates its diminished utility in this setting. Therefore, where the expressed-object approach collides with the reasonable-person approach, the better course is to maintain fidelity to the Court's more general principle of reasonableness, which is "[t]he touchstone of the Fourth Amendment" and is the overall standard by which the scope of consent is measured. *Jimeno*, 500 U.S. at 250-51.

Second, the expressed-object inquiry ignores the relevance of probation conditions and regulations in this context. The Court has explained that probation conditions and regulations are "salient circumstance[s]" to the reasonableness of suspicion-based probationary searches. *Knights*, 534 U.S. at 118; *see also Griffin*, 483 U.S. at 880 ("The search . . . was 'reasonable' . . . because it was conducted pursuant to a valid regulation."). We see no reason why these provisions would be relevant to the reasonableness of *suspicion*-based probationary searches but not to the reasonableness of *consent*-based probationary searches. Therefore, we look to the probation conditions and regulations to inform what a typical reasonable person would have understood by Henry's consent to a home visit.

Henry's probation conditions included two provisions governing officer conduct at his residence: the search condition and the visit condition. The search condition provided that Henry might be subject to search and seizure if his probation officer had reason to believe that he had "illegal drugs, alcohol, volatile substance, or other contraband" on his person or property. J.A. at 52 (Conditions of Supervision ¶ V.A). The visit condition provided that Henry had to permit his probation officer to visit his residence at any time but made no provision for search or seizure. J.A. at 53 (Conditions of Supervision ¶ VI.A). A reasonable person would evaluate the scope of a probationer's consent in light of these two conditions. If a probationer consented to officers entering his residence to look for contraband, a reasonable person would view the consent to encompass that which the search condition authorizes: a full search of his person and residence. In contrast, if a probationer consented to officers entering his residence simply to verify his address (a purpose which is decidedly *not* within the scope of the search condition), a reasonable person would *not* view the consent to extend to a full search of his person and residence because the visit condition does not give authority to search. Also relevant is the fact that the visit condition requires the probationer to submit to visits not just of his home but of his place of employment, too. It is inconceivable that a probationer's consent to an employment visit would extend to a full search of his place of employment; because the visit condition draws no distinction between home visits and employment visits, a reasonable person would expect the same limits on officer conduct to apply to home visits as well.

The probation *regulations* (as distinct from the conditions) also reflect a significant difference between searches and home visits. There is no mention of home visits in the search policy. *See* CORRECTIONS POLICIES 27-16-01. This absence is a telling indication that the Department of Corrections itself does not view home visits and searches as the same type of officer-probationer interaction. This reasoning is further supported by the "Supervision: Case Classification" policy, which sets out the types and number of contacts a probation officer must have with a probationer under his supervision. CORRECTIONS POLICIES 27-12-01. These requirements vary depending on the probationer's "supervision classification." Home visits are mandated for some levels of supervision. *Id.* ¶ VI.A.1-2. The other types of contacts required within these same classifications are "[p]ersonal [c]ontacts in the office," "[r]ecord [c]heck[s]," and "monthly

verification of employment."[18]   *Id.*   Each of these contacts represents a minimal invasion of the probationer's privacy.  The inclusion of home visits (and the notable absence of searches) in this category of contacts strongly suggests that home visits, too, are meant to be minimally invasive.

In sum, taking the government's factual allegations as true, Henry consented not to a contraband search but to a home visit to verify his address.  In light of the probation conditions and regulations reviewed above, it is clear that consent to a home visit does not encompass consent to a full search.  Officer McClish exceeded Henry's consent by conducting a full search,[19] so the government has failed to carry its burden that the search was consensual.

Because the instant search was authorized by neither reasonable suspicion nor consent, the district court should have granted Henry's motion to suppress.

## B.  Constitutionality of § 922(g)(1)

Section 922(g)(1) makes it "unlawful for any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  Henry appears to argue that in light of our recent decision in *Waucaush v. United States*, 380 F.3d 251 (6th Cir. 2004), the statute is unconstitutional as applied to him because the prosecution failed to show that Henry's possession of the ammunition had a substantial effect on interstate commerce.

### 1.  Failure to Raise Below

Henry did not raise his challenge to § 922(g)(1) below.  "It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Pinney Dock & Transp. Co. v. Penn Central Corp.*, 838 F.2d 1445, 1461 (6th Cir.) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)), *cert. denied*, 488 U.S. 880 (1988).  A court of appeals has discretion, however, to address issues not raised in the district court in "exceptional cases or particular circumstances" or when declining to do so would create "a plain miscarriage of justice." *Id.* (quoting *Hormel v. Helvering*, 312 U.S. 552, 557, 558 (1941)).

In *United States v. Chesney*, 86 F.3d 564 (6th Cir. 1996), *cert. denied*, 520 U.S. 1282 (1997), we exercised our *Pinney Dock* discretion to rule on the constitutionality of § 922(g)(1). *Id.* at 567-68.  In *Chesney*, we found "exceptional circumstances" in the fact that the appellant's argument was unavailable below because the Supreme Court decided *United States v. Lopez*, 514 U.S. 549 (1995), only after the district court had entered judgment. *Chesney*, 86 F.3d at 568.  Consideration of the issue was further justified by the fact that the issue was purely a legal question that the parties had fully briefed. *Id.* (citing *United States v. Real Property Known & Numbered as 429 South Main Street, New Lexington, Ohio*, 52 F.3d 1416, 1419 (6th Cir. 1995)).  We used similar reasoning to exercise our discretion to address a *Lopez*-based challenge to another federal criminal statute. *See United States v. Tucker*, 90 F.3d 1135, 1139 (6th Cir. 1996) (addressing and ultimately denying a *Lopez*-based challenge to 21 U.S.C. § 860(a)).

---

[18]"Personal contacts" simply means "face to face contact between the [o]fficer and the offender." CORRECTIONS POLICIES 27-12-01 ¶ IV.3.  A "record check" is "a local record check which may be completed at the clerk's office by reviewing printouts provided by local jails or court systems and using the administrative office of the courts automated system." *Id.* ¶ IV.4.  Verification of employment is not defined.

[19]There is no question that searching a bag is a full search and therefore exceeds the scope of consent, so we need not decide today exactly what officer conduct would fall *within* the scope of consent to a home visit.

Application of these factors shows that there are exceptional circumstances here. Henry bases his argument on *Waucaush*, a case decided by this court after the district court entered judgment, such that the argument was unavailable below. Furthermore, the issue is — as it was in *Chesney* — purely a legal question that both parties have fully briefed. Therefore, we choose to exercise our discretion to decide whether the conviction was constitutional in light of *Waucaush*.[20]

## 2. Merits

In *Waucaush*, the defendant and his fellow gang members murdered, conspired to murder, and assaulted, with intent to murder, members of rival gangs. 380 F.3d at 253. The defendant was convicted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), which forbids "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Waucaush*, 380 F.3d at 253. We held that "where the enterprise itself did not engage in economic activity" — as was true with this gang, which only engaged in "violence *qua* violence" — the prosecution had to show a substantial effect on interstate commerce. *Id.* at 256. The government failed to make such a showing, leaving "an enterprise whose activity was intrastate, noneconomic, and without substantial effects on interstate commerce." *Id.* at 258.

We explicitly held post-*Lopez* that a § 922(g)(1) conviction comports with the Commerce Clause so long as the defendant "possessed a gun that previously had moved in interstate commerce." *Chesney*, 86 F.3d at 572. Henry argues that after *Waucaush*, this showing no longer satisfies the Commerce Clause. Such a reversal of course from *Chesney* would constitute a radical and unjustified departure from the precedents of the Supreme Court, this court, and our sister circuits. First, *Chesney* relied heavily on the Supreme Court's interpretation of the predecessor to § 922(g)(1). *Id.* at 571 ("The Supreme Court has held that proof that a firearm moved in interstate commerce at any time is sufficient to meet the government's burden of proving the 'in commerce or affecting commerce' element of § 1202(a), the predecessor to § 922(g)(1)." (citing *Scarborough v. United States*, 431 U.S. 563, 566-67 (1977)); *see also id.* (discussing the Supreme Court's interpretation of § 1202(a) in *United States v. Bass*, 404 U.S. 336, 339 n.4 (1971)). Second, in cases decided both before and after *Waucaush*, we reaffirmed *Chesney* while rejecting as-applied challenges to § 922(g)(1). *See United States v. Sawyers*, 409 F.3d 732, 735-36 (6th Cir. 2005); *United States v. Murphy*, 107 F.3d 1199, 1211-12 (6th Cir. 1997). Third, every other circuit to have addressed the issue has held, consistently with *Chesney*, that the Commerce Clause requires no proof other than that the firearm or ammunition traveled in interstate commerce.[21] *See United States v. Wilkerson*, 411 F.3d 1, 9-10 (1st Cir. 2005) (reaffirming the First Circuit's case law upholding § 922(g)(1) and citing cases from the Second, Fourth, and Fifth Circuits); *United States v. Dorris*,

---

[20] We do not read Henry's brief to also argue that § 922(g)(1) is unconstitutional on its face. In any event, we would decline to exercise our discretion to address such a challenge because Henry had ample opportunity to raise the argument below: in contrast to the as-applied issue, Henry points to no case decided subsequent to his conviction that has arguably disturbed our numerous precedents rejecting facial challenges to § 922(g)(1). *United States v. Sawyers*, 409 F.3d 732, 735-36 (6th Cir. 2005); *United States v. Thompson*, 361 F.3d 918, 922-23 (6th Cir.), *cert. denied*, — U.S. —, 125 S. Ct. 223 (2004); *Loney*, 331 F.3d at 524; *Carnes*, 309 F.3d at 954; *United States v. Murphy*, 107 F.3d 1199, 1210-12 (6th Cir. 1997); *United States v. Sanders*, 97 F.3d 856, 862 (6th Cir. 1996), *cert. denied*, 519 U.S. 1132 (1997); *United States v. Murphy*, 96 F.3d 846, 847-48 (6th Cir. 1996); *Chesney*, 86 F.3d at 568-70; *United States v. Turner*, 77 F.3d 887, 888-89 (6th Cir. 1996); *see also Thompson*, 361 F.3d at 922 (citing *United States v. Williams*, 128 F.3d 1128, 1133-34 (7th Cir. 1997) (citing decisions rejecting facial challenges to § 922(g)(1) from all regional courts of appeals other than the District of Columbia Circuit)); *Chesney*, 86 F.3d at 568 (citing decisions rejecting facial challenges to § 922(g)(1) from all regional courts of appeals other than the Fifth and District of Columbia Circuits).

[21] It appears that only the District of Columbia Circuit has not addressed the as-applied constitutionality of § 922(g)(1).

236 F.3d 582, 586 & n.1 (10th Cir. 2000) (reaffirming the Tenth Circuit's case law upholding § 922(g)(1) and citing cases from the Second, Third, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits), *cert. denied*, 532 U.S. 986 (2001).  Fourth, to the extent that *Waucaush* and *Chesney* conflict, we would remain bound by *Chesney* because it was decided first.  *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985); 6TH CIR. R. 206.  Finally, *Waucaush* does not discuss or even cite § 922(g)(1) or *Chesney*, suggesting that the panel had no intention of making its holding applicable to the felon-in-possession statute.

Henry concedes that the government satisfied § 922(g)(1)'s jurisdictional element as interpreted by *Chesney*.  Therefore, Henry's conviction under § 922(g)(1) was constitutional.

### III.  CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's denial of Henry's motion to suppress, **VACATE** Henry's conviction and sentence, and **REMAND** the case for further proceedings consistent with this opinion.