*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0353p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

JEFFREY SCOTT HERNDON,

        *Defendant-Appellant.*

No. 06-5522

>

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00199—Robert L. Echols, District Judge.

Argued: May 31, 2007

Decided and Filed: August 31, 2007

Before: GIBBONS and COOK, Circuit Judges; CLELAND, District Judge.[*]

---

## COUNSEL

**ARGUED:** Robert D. Baker, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Eli J. Richardson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Robert D. Baker, Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. S. Carran Daughtrey, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

## OPINION

---

    JULIA SMITH GIBBONS, Circuit Judge. Defendant-appellant Jeffrey Scott Herndon was convicted in Tennessee state court of multiple counts of sexual exploitation of a minor and, after serving a brief term of imprisonment, placed on probation subject to certain terms and conditions, including a series of Sex Offender Directives issued by the Tennessee Board of Probation and Parole. During the course of an inspection of Herndon's home computer to check Herndon's compliance with the Directives' prohibition on home Internet access, Herndon's probation officer discovered child pornography on an external hard drive located in Herndon's bedroom. The probation officer contacted local police officers who seized the materials. The United States charged Herndon with receipt and possession of child pornography. After the district court denied Herndon's motion to suppress the evidence against him, Herndon pled guilty to one of the counts against him,

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

and the district court sentenced him to 72 months imprisonment. On appeal, Herndon challenges the district court's denial of his motion to suppress the evidence against him.

For the reasons that follow, we affirm.

I.

The underlying facts in this case – as set forth in large part at Herndon's suppression hearing before the district court – are as follows. In November 2001, Herndon was convicted in Davidson County, Tennessee of three counts of sexual exploitation of a minor. In May 2002, after serving nine months in prison, Herndon was released and placed on probation. As a condition of his probation, Herndon was subject to a set of Sex Offender Directives produced by the Tennessee Board of Probation and Parole. The Directive relevant to this appeal provides:

> 5. You will not have Internet access on your computer unless permission for Internet capability has been approved in writing by your Officer. You consent to your Officer checking your computer and any software at any time for Internet capability or activity.

Herndon indicated his understanding of the terms of his probation by signing a copy of the Tennessee probation board's standard probation order, as well as a copy of the Directives.

As required, Herndon enrolled in a sex offender treatment program administered by the Associates of Sexual Assault Prevention, an organization run by John Brogden. During the course of his treatment, Herndon produced two written assignments, per the requirements of his program. The first was a letter of apology written to the victim of his crime and intended solely for use as an evaluative tool. Herndon's apology letter began with an expression of remorse but proceeded to level a series of thinly veiled accusations against the victim. Brogden informed Herndon that his letter was unsatisfactory and directed him to make another attempt, leaving out the "cognitive distortions and victim blaming." In response, Herndon produced a lengthy missive expressing his disdain for societal proscriptions on child sex, noting that "every child has the right and should be free to learn about sex from an adult who can show them the right way to do things and how good sex can and should be," and deriding the "myth of childhood innocense [sic]." Because Herndon had no respect for the philosophical underpinnings of Brogden's therapeutic approach, he was "proud" of his score of zero on his initial apology letter. Brogden terminated Herndon from his program prior to Herndon's completion, citing his "chronic poor performance in treatment, generally; financial irresponsibility; extreme distorted thinking about sex with children; and [his] failure to complete assignments."

On the morning of February 4, 2003, Herndon met with George Harrien, the probation officer then assigned to his case. Herndon informed Harrien that Brogden had terminated him from his sex offender treatment program. When Harrien inquired into Herndon's employment status, Herndon assured him that he was looking for a job "and that he had actually been on the Internet seeking employment . . . ." Because the terms of Herndon's probation prohibited certain Internet access, Herndon's reference to seeking employment online alarmed Harrien.

Following his meeting with Herndon on February 4, Harrien received copies of the materials Herndon produced in therapy as well as court records relating to Herndon's original offense. That same day, Brogden communicated to the probation office his concerns regarding Herndon's potential danger to the community, specifically advising the office that he believed that Herndon represented a "high risk" and required greater supervision than was provided in his program. Based upon his conversation with Herndon, which revealed Internet activity and a lack of employment, the information from Brogden concerning Herndon's conduct in treatment, and the

information on the nature of Herndon's offenses, Harrien sought and received approval for an inspection of Herndon's computer pursuant to the authority of Directive 5.

At approximately 3 o'clock on February 4, Harrien, along with another probation officer, Calvin Burden, arrived at the residence Herndon shared with his mother. Herndon answered the door and, upon Harrien's request to check his computer, led the officers into a converted garage that served as his bedroom. Herndon retrieved a laptop computer from under a pillow on his bed, and Harrien proceeded to examine the computer's Internet history. There, he discovered a number of files with female names in the filenames but was unable to access any of the files because the necessary drive was missing.

Harrien then loaded and ran prescan software, also referred to as presearch software, on Herndon's laptop. Prescan software provides information on the source of images contained on a computer, by, for instance, including a web address in the file name, or indicating that a file is stored in a temporary Internet cache file. It also allows a user to inspect the contents of a computer's drives for different types of images. In this case, it permitted Harrien to discover a number of thumbnail images stored on Herndon's computer. Although Harrien was certain that the images were pornographic, he could not conclusively establish whether the images involved adults or children. During the scan of the C-drive on Herndon's laptop, Burden alerted Harrien to the presence of an external hard drive placed at the foot of the bed, plugged into the wall, but unconnected to the laptop computer. Harrien connected the hard drive to the laptop computer, and a scan of the material on that drive revealed multiple thumbnail images that Harrien identified as child pornography.

Realizing the implications of his discovery, Harrien contacted his supervisor and Assistant District Attorney Bernie McAvoy, who dispatched uniformed police officers and detectives to the residence. The uniformed officers arrived first and placed Herndon under arrest. Approximately an hour later, Detective Kevin Cooley of the Nashville Police Department arrived. Cooley testified at Herndon's suppression hearing that, upon his arrival, he observed on Herndon's computer twelve images of a prepubescent female in different sexual positions. The officers seized Herndon's laptop in addition to two or three hard drives. Cooley successfully applied for a search warrant to examine the computer and its external drives. An examination of the computer and its attendant drives revealed approximately 58,000 images and 3000 videos of child pornography involving prepubescent children.

Herndon remained in state custody from the time of his arrest in February 2003 until December 2004. On December 20, 2004, he was taken into federal custody. On November 17, 2004, a grand jury empaneled in the Middle District of Tennessee issued a two-count indictment charging Herndon with knowing receipt and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(a)(5)(B). Herndon moved to suppress the evidence against him on the ground that the government secured it in violation of his rights under the Fourth Amendment. The district court granted Herndon's motion as to written materials relating to the subject of pedophilia discovered on Herndon's computer but denied the motion as to the pornographic images and videos discovered on the computer.[1] Herndon filed a second motion asserting that the scope of the consent provided in his probation order extended no further than activities on the part of his probation officer and that the police's seizure of his computer was therefore unlawful. The district court issued a second written order denying that motion, citing the plain view exception to the Fourth Amendment's warrant requirement.

---

[1]The district court also denied Herndon's motion as to a collection of written materials taken by members of the United States Marshal's office upon Herndon's transfer to federal custody. On appeal, Herndon does not challenge that portion of the district court's ruling.

After the denial of his suppression motions, Herndon entered into a plea agreement with the government, agreeing to plead guilty to the first count of the indictment, charging him with knowingly receiving and attempting to receive child pornography in violation of 18 U.S.C. § 2252(a)(2)(A). The district court sentenced Herndon to 72 months imprisonment. Herndon filed a timely notice of appeal.

II.

Herndon's challenge on appeal arises out of the district court's denial of his motions to suppress. He contends that the district court incorrectly concluded that Harrien lawfully conducted an examination of the contents of Herndon's computer and external drives and that the government failed to meet its burden of proof establishing the applicability of the plain view exception. We take each argument in turn, reviewing the trial court's factual determinations for clear error and its legal conclusions *de novo*. *United States v. Ostrander*, 411 F.3d 684, 694 (6th Cir. 2005).

A.

Herndon argues, first, that the district court should have suppressed the evidence against him because Harrien exceeded the scope of his authority under the terms of Herndon's probation. The Fourth Amendment bars unreasonable searches and seizures by the government. U.S. Const. amend. IV. "A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). However, the Supreme Court has made clear that the nature of the relationship between state actors and individuals subject to state supervision in lieu of or following release from prison alters the relevant analysis under the Fourth Amendment. The Court's jurisprudence on the subject has yielded two distinct doctrinal frameworks, set forth most notably in its opinions in *Griffin* and *United States v. Knights*, 534 U.S. 112 (2001).

In *Griffin*, the Supreme Court assessed the validity of a search conducted pursuant to a state regulation permitting a warrantless search of a probationer's home where a probation officer had "reasonable grounds" to believe that the probationer was in possession of contraband. 483 U.S. at 870-71. The Court concluded that supervision of probationers constituted a "special need" justifying a comparatively greater intrusion on the privacy of individuals subject to the terms and conditions of probation. *Id.* at 875. It deemed the search of the petitioner's residence reasonable under the Fourth Amendment "because it was conducted pursuant to a valid regulation governing probationers," *id.* at 880, that is, a regulation that independently satisfied the Fourth Amendment's reasonableness requirement, *id.* at 873.

In *Knights*, the Court considered the broader question it expressly declined to address in *Griffin*: that is, whether a warrantless search of a probationer could be reasonable under the Fourth Amendment. 534 U.S. at 117-18. *Knights* involved the propriety of a search taken under the authority of a probation order allowing the search of a probationer's "person, property, place of residence, vehicle, or personal effects" in the absence of a search warrant, arrest warrant, or reasonable cause. *Id.* at 114. The Court held that the search of the probationer's home conducted by a law enforcement official aware of the condition was reasonable, not under the special needs doctrine, but in light of the Court's "general Fourth Amendment approach of examining the 'totality of the circumstances' with the probation search condition being a salient circumstance." *Id.* at 118 (internal citation omitted). The Court ruled that the balance of the factors relevant in the totality of the circumstances analysis – the probationer's reduced expectation of privacy and the competing governmental interest in monitoring probationers – led to the conclusion that reasonable suspicion was sufficient to conduct a search of a probationer's home. *Id.* at 121. Thus, under *Knights*, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is

engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121.[2]

*Griffin* and *Knights* represent two distinct analytical approaches under which a warrantless probationer search may be excused. *See United States v. Freeman*, 479 F.3d 743, 746 (10th Cir. 2007) (observing that *Griffin* and *Knights* are "two exceptions to the Fourth Amendment's warrant requirement in the context of [probationer] searches"). Although *Griffin* remains a legitimate basis for justifying such a search, we conclude that it is ill-fitted to the present case. In applying *Griffin*, the Sixth Circuit has formulated a two-pronged inquiry that calls for (1) an examination of the validity of the relevant provision authorizing a search and (2) a determination of whether the search complied with the applicable provision. *United States v. Henry*, 429 F.3d 603, 608 (6th Cir. 2005). Our court has generally tested a search condition's validity by confirming the presence of a reasonable suspicion requirement and its consistency with the federal reasonable suspicion standard. *See, e.g., id.* at 609 ("Because Kentucky's probationary search policy incorporates both the quantum of evidence (i.e., reasonable suspicion) approved in [*United States v.*] *Payne*[, 181 F.3d 781 (6th Cir. 1999)] and the breadth (i.e., not just contraband but any probation violation) approved in [*United States v.*] *Loney*[, 331 F.3d 516 (6th Cir. 2003)], we hold that the policy is reasonable under the Fourth Amendment."). Here, the Directive authorizing a check of Herndon's computer and software included no reasonable suspicion requirement that cabined the authority vested in his probation officer. Thus, Harrien's check of Herndon's computer may not be justified as a special needs search under *Griffin*. We nevertheless must consider whether Harrien's inspection may be validated under the more general Fourth Amendment totality of the circumstances approach outlined in *Knights*.

Before proceeding, we pause to note that the object of Harrien's suspicion – Herndon's potential violation of the terms of his probation as opposed to a generally applicable criminal statute – does not impact the availability of the *Knights* framework. For the purposes of our Fourth Amendment inquiry here, a probationer's violation of the terms of probation is comparable to his violation of a criminal statute. *See* Tenn. Code Ann. § 40-35-306 (authorizing a court, in the event of a probation violation following confinement, to impose a sentence in the local jail or workhouse or department of correction); Tenn. Code Ann. § 40-35-311(a) ("Whenever it comes to the attention of the trial judge that any defendant, who has been released upon suspension of sentence, has been guilty of any breach of the laws of this state or has violated the conditions of probation, the trial judge shall have the power to cause to be issued under the trial judge's hand a warrant for the arrest of the defendant as in any other criminal case."); *see also United States v. McCarty*, 82 F.3d 943, 948 (10th Cir. 1996) ("Violation of probation constitutes indirect contempt of court under Wyoming law and constitutes a crime punishable by imprisonment."). Moreover, our sister circuits have consistently applied the *Knights* regime to searches undertaken to investigate potential violations of probation or parole. *See, e.g., Freeman*, 479 F.3d at 748-49 ("To determine whether reasonable suspicion for suspecting a parole violation exists, we consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances."); *United States v. Williams*, 417 F.3d 373, 377 (3d Cir. 2005) (ruling that police officer "reasonably suspected that [defendant] was violating his parole . . . when [third party] told her that Williams was suspected of having a gun"); *United States v. Lifshitz*, 369 F.3d 173, 181 (2d

---

[2]The Court recently extended its *Knights* holding as it relates to parolees. In *Samson v. California*, 126 S.Ct. 2193 (2006), the Court considered the constitutionality of a California statute requiring parolees to agree "to be subject to search or seizure by a parole officer or other peace office at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 2196 (quoting Cal. Penal Code § 3067(a)). Invoking the "totality of the circumstances" approach utilized in *Knights*, the Supreme Court ruled the statute valid, *id.* at 2196, and concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee," *id.* at 2202. It is not yet clear whether courts will apply *Samson*'s sanction of warrantless and suspicionless searches to probationers as well as parolees, as the Court in *Samson* recognized that parolees have a lesser expectation of privacy than probationers, because parole is more akin to imprisonment. *Id.* at 2198. The Sixth Circuit has not considered the question, and its resolution is not necessary to our decision in this case.

Cir. 2004) ("Probationary searches – whether for law enforcement or probationary purposes – are acceptable under *Knights* if based upon reasonable suspicion.").[3]  Thus, it is irrelevant that Harrien sought evidence of a probation violation rather than proof that Herndon had engaged in universally proscribed activity.

Under *Knights*, a search of a probationer's property must be tested for reasonableness in light of the totality of the circumstances "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 119 (internal quotation marks omitted). As to the first issue—the reasonableness of Herndon's expectation and the extent of the privacy intrusion occasioned by the investigation in the instant case—two facts underscore Herndon's significantly reduced privacy interest in the contents of his computer.  First, Herndon was subject to state-ordered probation and cannot reasonably assert the same measure of privacy protection afforded individuals not subject to state supervision.  "To a greater or lesser degree, it is always true of probationers . . . that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin*, 483 U.S. at 874 (internal quotation marks omitted) (brackets in original).  In addition, the specific terms of Herndon's probation, to which he assented, alerted him to his reduced privacy expectation.  Directive 5 makes clear that Herndon was surrendering to checks of his "computer and any software at any time for Internet capacity or activity."  This provision authorized Harrien to check Herndon's computer for Internet connectivity and activity at any time without restriction, creating a significant limit on any privacy interest Herndon may have held in the computer.  *See Knights*, 534 U.S. at 119-20 ("The probation order clearly expressed the search condition and Knights was unambiguously informed of it.  The probation condition thus significantly diminished Knights' reasonable expectation of privacy.").  These factors taken together confirm that Herndon enjoyed a dramatically reduced privacy interest and that Harrien's intrusion was, thus, relatively less serious.

Herndon responds that although he consented to certain computer checks, he never agreed to the degree of intrusion occasioned by Harrien's check on February 4.  He contends that while Directive 5 allowed the examination of what he describes as "public" spaces on his computer, it did not permit the inspection of "private" areas, that is, the storage spaces on his computer, including any external drives.  This argument is without merit.  The public/private distinction Herndon urges us to adopt was not present in Directive 5, which provided for checks of Herndon's "computer and any software," without limitation on the inspection of storage spaces to the extent such an inspection would yield information regarding Herndon's Internet capabilities and activities.  Moreover, the language of Directive 5 can reasonably be construed to encompass the storage areas on Herndon's computer, including any peripheral drives, as the term "computer" is commonly understood to include the collection of components involved in a computer's operation.  Herndon's reliance on *United States v. Roark*, 36 F.3d 14 (6th Cir. 1994), for support of his position to the contrary is misplaced.  In *Roark*, the Sixth Circuit held that police officers exceeded the scope of a woman's consent to search "her residence" when they proceeded to search a second house located on her property.  *Id.* at 17.  As the government correctly observes, the analogy between a primary residence and an outbuilding—which are largely independent save their presence on the same plot of land— and a computer and its external hard drive—one of which is dependent upon the other for its function—is strained at best.  It also bears emphasis that Directive 5 permitted not only checks for Internet capacity, but also Internet activity.  Harrien testified that upon his initial check of the

---

[3]We recognize that in *Henry*, a panel of this court elected to apply *Griffin* to a probationer search on the theory that "the search of [defendant's] residence was conducted for a probationary purpose – to verify that he was not violating the residency condition of his probation."  429 F.3d at 608 n.5.  However, *Henry* recognizes a distinction between probationary and investigatory searches that is absent from *Knights*.  While we ultimately find no fault in *Henry's* reliance on *Griffin*, we believe ourselves free to rely on *Knights* as a ground for justifying Harrien's inspection.

Internet history, he could not confirm Internet activity on Herndon's computer and proceeded to utilize the prescan software. It was not improper for Harrien to check the drives of Herndon's computer for materials that one might download via the Internet as a means of ascertaining whether Herndon had engaged in Internet "activities."[4] Thus, Herndon is incorrect about the meaning of Directive 5 and the extent to which it affected his privacy interest. At least as to the contents of his computer, Directive 5 substantially reduced Herndon's expectation of privacy, making Harrien's inspection comparatively less intrusive.

As to the government's competing interest, the Supreme Court has "repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, 126 S.Ct. at 2200. In articulating the nature of the interest at stake for the government, the Court has placed special emphasis on probationers' greater likelihood of committing crimes and the state's need, as a consequence, to take special pains to monitor their conduct and prevent any return to criminality. *Knights*, 534 U.S. at 120 ("The recidivism rate of probationers is significantly higher than the general crime rate."); *Griffin*, 483 U.S. at 875 (observing that goals of rehabilitation and protection of the community both "require and justify the exercise of supervision to assure that the restrictions are in fact observed").

The requisite weighing of Herndon's diminished privacy interest in his computer activities and the government's comparatively substantial interest in monitoring probationers' activities leads us to the conclusion that Harrien required no more than reasonable suspicion to conduct a check of Herndon's computer. *Knights*, 543 U.S. at 119-21. On this issue, Herndon contends that the information possessed by Harrien did not provide him with the necessary reasonable suspicion to conduct a check under Directive 5. The Supreme Court has directed reviewing courts making reasonable suspicion determinations to consider "the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); *see also Payne*, 181 F.3d at 788. "[T]he likelihood of [wrongdoing] need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274.

At Herndon's suppression hearing, Harrien testified that Herndon had informed him that he was seeking employment using the Internet. According to Harrien, this alerted him to the possibility that Herndon was violating the terms of his probation by engaging in unauthorized Internet use. As an initial matter, although Herndon represented at his suppression hearing that he never mentioned the Internet to Harrien, the district court expressly adopted Harrien's account of the exchange between the two men. On appeal, Herndon does not directly challenge this finding as clearly erroneous, and there is nothing in the record that would warrant such a conclusion. Therefore, we leave this factual finding undisturbed.

Herndon's mention of Internet usage in the pursuit of employment provided Harrien with reasonable suspicion to believe that Herndon was violating his probation. Harrien received the information concerning Herndon's computer use from Herndon himself during an in-person meeting, and Herndon said nothing further that would relieve Harrien's concerns regarding Herndon's possible unauthorized Internet usage. Although Harrien could have elicited further clarifying information from Herndon concerning his use of the Internet, his failure to do so does not affect the

---

[4]The cases to which Herndon directs our attention, *United States v. Balon*, 384 F.3d 38 (2d Cir. 2004), and *United States v. Henderson*, 416 F.3d 686 (8th Cir. 2005), are factually distinct and offer no assistance in resolving the matter before us. *Balon* involved a challenge to the terms of supervised release. 384 F.3d at 41. *Henderson* considered whether a search was conducted consistent with the limits of a search warrant. 416 F.3d at 695.

conclusion that his conversation with Herndon on February 4, 2003, provided him with reasonable suspicion that Herndon had violated Directive 5's prohibition on home Internet use.

We conclude, therefore, that Harrien engaged in a lawful inspection of Herndon's computer, pursuant to his authority under Directive 5.

B.

Herndon argues, alternatively, that even if Harrien did not exceed the boundaries of his authority under the Sex Offender Directives, the district court should have nevertheless suppressed the images because they were unlawfully seized by members of the Nashville Police Department. The government responds that the images were in plain view of the police officers who arrived at Herndon's home and that they were therefore free to seize them without a warrant or probable cause.

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The government has the burden of proving the legality of a warrantless search. *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002). On appeal, Herndon does not contend that the police unlawfully entered his home and bedroom but challenges the adequacy of the proof the government offered at his suppression hearing to demonstrate the applicability of the plain view exception.

At the suppression hearing, Herndon testified that after Harrien conducted a check of his computer, Harrien contacted his supervisor and Bernie McAvoy, an assistant district attorney. McAvoy sent two uniformed police officers to "secure the scene." Approximately one hour later, Detectives Kevin Cooley and Grant Carroll arrived. Cooley, who seized the computer and hard drive, testified as follows concerning his arrival at the Herndon home:

> I then went back into the room, which happened to be the residence, and witnessed the computer. His computer had a screen shot of 12 photos of a prepubescent female in different sexual positions . . . . And I took a picture of this. I took a picture of the room, the series of computers and hard drives that were all connected to one another.

He later testified:

> Q: When you arrived at the scene and saw the child pornography on Mr. Herndon's computer, did you have to manipulate the computer in order to see those? Or were they visible to you without your having to touch the computer?
>
> A: No. I believe they were visible when I got there. There was [sic] 12 images on the program that they – George Harrien had used when I got there. I could see all 12 at once. I just took a picture of it with my digital camera, which I used to go before the – to get his bond set on him later that night, from a commissioner.
>
> Q: So you did not manipulate the computer at all, except to seize it?
>
> A: Correct. After I seized it, all I did was turn it off.

Herndon finds this testimony unsatisfactory on the theory that it fails to account for the activities of the two unnamed officers who first arrived at the scene and placed him under arrest. Without saying as much, Herndon implies that the first two officers at the scene may have engaged in unlawful activities following their arrival.

Although the testimony of the two officers might have been helpful, one can reasonably infer upon review of the entirety of the record that Cooley discovered the images in plain view. Harrien testified at the suppression hearing that after completing a scan of Herndon's external hard drive, he discovered multiple thumbnail images of child pornography, which were displayed on the screen of Herndon's laptop. His account is uncontested. Coupled with Cooley's testimony concerning what he observed upon arriving in Herndon's bedroom, Harrien's testimony explains how the images appeared on Herndon's computer screen and how they became plainly visible to Cooley who, as he testified, did not take any additional steps to see the pictures.

Herndon's attempt to rebut this legitimate inference is unavailing. At no point during the suppression hearing did he suggest that the first two officers to arrive at the scene engaged in inappropriate handling of his computer prior to Cooley's arrival. Thus, the only evidence before the district court and before this court on appeal establishes that the images appeared on Herndon's computer screen following Harrien's lawful inspection, and Cooley observed those images when he walked into the room. In his attempt to raise suspicion about intervening events, Herndon misrepresents both the testimony before the district court and its factual findings. Although Herndon claims that the two unnamed officers took pictures and did "investigative work" while waiting for Detective Cooley, the transcript of Harrien's testimony, from which this statement is drawn, makes reasonably clear that these activities occurred *after* Cooley's arrival and that it was likely Cooley who conducted the relevant investigative work.

Q: And what happened when the officers and detectives arrived?

A: The two officers arrived first. . . . After speaking with me and Officer Burden, they spoke with Mr. Herndon. They basically were waiting on the detectives to come in. And from that point, the detectives took over. . . . And I wasn't much involved after that. I noticed that they were taking pictures and doing investigative work.

Indeed, Cooley testified to taking pictures after his arrival, confirming his role in the investigation. Nor, as Herndon contends, did the district court find that the probation *and* police officers were responsible for placing the images in plain view for Detective Cooley. Rather, the district court concluded that the probation officers and the police officials had *witnessed* child pornography on the computer. The district court's finding is neither clearly erroneous nor suggestive of improper behavior on the part of the initial officers on the scene.

Herndon cites the Second Circuit's opinion in *United States v. Kiyuyung*, 171 F.3d 78 (2d Cir. 1999), to bolster his challenge to the government's evidence in his case. In *Kiyuyung*, two New York City policemen, Officers Abousamra and Quiles, agreed to allow a woman whom they had placed under arrest to re-enter her home to use the restroom. *Id.* at 80. Prior to allowing her to enter, Abousamra conducted a brief inspection of the home, including a long hallway leading to the bathroom and the bathroom itself. *Id.* Abousamra testified at a later suppression hearing that he observed no contraband during his initial inspection. *Id.* He further claimed that while the two officers stood outside the bathroom waiting on the woman, Quiles pointed out a firearm located on a shelf inside a closet immediately outside the bathroom. *Id.* The officers later discovered two other firearms in the same closet. *Id.* When the officers confronted the woman concerning the guns, she informed them that they belonged to her boyfriend, who later arrived and confessed to owning the guns. *Id.* at 82. The boyfriend, Kiyuyung, was charged with being a felon in possession of a firearm and subsequently moved to suppress the guns. *Id.* The district court denied that motion, citing the plain view doctrine. *Id.* Kiyuyung was convicted following a bench trial and later appealed. *Id.* at 82-83. In a unanimous decision, the Second Circuit ruled that the government had failed to carry its burden of showing the applicability of the plain view doctrine, *id.* at 83, noting that Quiles, who had

originally discovered the guns, did not testify at the suppression hearing and, thus, had not confirmed that he actually saw the guns in plain view. *Id.* at 84.

*Kiyuyung* is distinguishable from the present case. The record before us is uncluttered by the inconsistencies that likely undermined the government's position in *Kiyuyung*. There, the court noted that Abousamra had offered conflicting testimony concerning when he first saw the guns, first asserting during his grand jury testimony that he had seen the guns during his initial inspection, and later stating that Quiles saw the guns first. *Id.* at 81. No such discrepancies are present here. Further, in *Kikuyung*, there were serious questions about how the guns became apparent to the two officers. Abousamra was unable to recall whether the closet in which the guns were found had doors, how those doors opened, or whether the doors were open or shut when the officers discovered the guns. *Id.* at 84. The court expressed surprise over Abousamra's inability to relate such pertinent details, and this failure was relevant to its conclusion regarding the government's failure to satisfy its burden of proof. *Id.* (noting that Abousamra "did not testify that the closet doors were open before Branch entered the bathroom, did not testify that Quiles said the closet doors were open, and did not even venture to ascribe to Quiles a conclusory statement that the first gun had been in plain view"). Here, however, Harrien offered unequivocal and uncontested testimony describing how the pornographic images appeared on Herndon's computer screen. Although Herndon implies that something untoward may have occurred after Harrien's inspection, this speculation alone is insufficient to undermine the government's proof that Cooley discovered the images in plain view when he entered Herndon's room.

III.

We accordingly affirm the district court's denial of Herndon's motion to suppress.