**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0813n.06

No. 14-3027

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 24, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | On Appeal from the United States |
| v. | ) | District Court for the Southern |
| | ) | District of Ohio |
| DAVID G. PAYNE, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____/ | ) | |

Before: GUY, CLAY, and WHITE, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** Defendant David G. Payne appeals from the denial of his motion to suppress evidence following his conditional plea of guilty to one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Payne moved to suppress the firearm and drugs seized during a warrantless search of the residence he shared with Erin Ratleff, who was on post-release control at the time. After an evidentiary hearing, the district court found the search was reasonable under the Fourth Amendment's totality-of-the-circumstances standard articulated in *Knights* since there was probable cause to believe Ratleff was living there in violation of the conditions of her release. *See United States v. Knights*, 534 U.S. 112 (2001). We affirm.

**I.**

Payne, a previously convicted felon, was indicted on firearm and drug charges based on the seizure of evidence, including a loaded .38 caliber Llama revolver and several bags of cocaine and marijuana, from his residence at 117 Powers Street on August 21, 2012.  The district court summarized its factual findings as follows (citations to the transcript have been omitted):

> In the spring of 2012, the Bellefontaine Police Department ("BPD") received a complaint from a local business concerning potential drug trafficking activity at or around 117 Powers Street ("Powers Street Residence").  Following receipt of this tip, BPD Detective [Craig] Comstock conducted several spot checks on the Powers Street Residence.  Officer Comstock wanted to search the Powers Street Residence but had no legal justification for doing so.  However, during this surveillance, Detective Comstock observed female Erin Ratleff ("Ratleff") coming and going from the Powers Street Residence.
>
> Ratleff was on post release control under the supervision of Parole Officer Chris Niekamp of the Logan County office of the Ohio Adult Parole Authority ("APA").  At the time she agreed to her conditions of supervision, Ratleff provided Officer Niekamp with the residence of her mother as the location where she was living.  She also acknowledged her obligation to immediately inform Officer Neikamp of any changes in residency.  Finally, Ratleff agreed that any property where she was actually living would be subject to search by Officer Niekamp.
>
> During the time that Detective Comstock was surveiling the Powers Street Residence, he ran across Ratleff in the Bellefontaine community.  Detective Comstock observed Ratleff driving cars associated with the Powers Street Residence approximately 20 or 25 times.  The cars that Detective Comstock associated with the Powers Street Residence were registered with Payne or Ratleff's mother.  Finally, Detective Comstock knew that Ratleff was on post release control.
>
> In 2012, Detective Comstock contacted the owners of the Powers Street Residence and obtained the current rental agreement.  This Rental Agreement is for the period of July 1, 2011 through June 30, 2012, [and] automatically renewed at the termination of each 12 month lease period.  Payne and Ratleff are listed as the tenants and both signed the Rental Agreement.  Included [on the second page] is a handwritten addendum dated 8/11/12 which states that, "Tenants agree to rent month to month while home is listed for sale.  Tenant will receive 30 days to vacate home when home sells.  Agrees to all other terms of rental agreement."  Finally, the owners of the Powers Street Residence told Detective Comstock that they were aware that Payne and Ratleff were living there together.

Detective Comstock informed Officer Niekamp of the ongoing surveillance connecting Ratleff to the Powers Street Residence and of the Rental Agreement. Officer Niekamp became concerned that Ratleff had changed her residence without notifying the APA.

On May 8, 2012, Ratleff had met with Officer Niekamp to review the conditions of her supervision. Ratleff advised Niekamp that she was staying with her mother at that time. Ratleff never informed Niekamp that she had taken out a lease on the Powers Street Residence.

Following [that] meeting, Officer Niekamp stopped by Ratleff's mother's apartment several times. During these visits, he never made contact with Ratleff there.

On one visit, Officer Niekamp did make contact with Ratleff's mother. Ratleff's mother told Officer Neikamp that Ratleff lived in the apartment but [that] she also stays some with Payne. Also, based upon what Officer Niekamp saw and did not see at Ratleff's mother's apartment and knowing that Ratleff was unemployed, he questioned whether Ratleff actually lived there.

Given his concern that Ratleff did not actually live at her mother's apartment but had not reported a change of residence, Officer Niekamp and Detective Comstock established surveillance of the Powers Street Residence during the morning of August 21, [2012]. Detective Comstock had agreed to assist Officer Niekamp investigate . . . Ratleff's possible parole violation. Detective Comstock also believed that the surveillance may advance his own investigation of potential drug trafficking activity at the Powers Street Residence, which potentially implicated Ratleff.

While on this surveillance, Officer Niekamp and Detective Comstock observed a car parked in front of the Powers Street Residence that Officer Niekamp had previously seen Ratleff drive on her visits to the APA. This car that Officer Niekamp had previously seen Ratleff driving was registered to Payne.

Officer Niekamp and Detective Comstock observed Ratleff come out of the Powers Street Residence. They approached Ratleff and met her on the sidewalk. Officer Niekamp, who was well-known to Ratleff, said "Erin, I need to speak to you, . . . The gig is up. I know you are not living where you say you are. I know that you are living here." At that point, Ratleff became very emotional and began crying.

Officer Niekamp told Ratleff that "[w]e need to go in the house." Based upon Ratleff's reaction when confronted along with the lease agreement for the Powers Street Residence, the multiple observations of Ratleff at the Powers Street Residence including her presence there on August 21, the fact that Ratleff was not

denying living at the Powers Street Residence, and not being able to locate her at the residence where she said she was living, Officer Niekamp was positive that Ratleff was living at the Powers Street Residence.

Given this belief, Officer Niekamp asked Ratleff to step inside the Powers Street Residence. [Ratleff went in first, picking up her 15-month-old daughter in the doorway.] As they entered the Powers Street Residence, Officer Niekamp observed Payne sitting on a couch preparing to roll a [marijuana] joint. There is no evidence that Payne consented to the search of the Powers Street Residence. Payne was stood up and handcuffed to ensure everyone's safety.

Officer Niekamp then briefly spoke with Ratleff. Ratleff confirmed that she lived at the Powers Street Residence. Officer Niekamp then conducted a parole [authorized] search of the Powers Street Residence [with the help of Detective Comstock]. Officers found a firearm and various controlled substances in the [kitchen of the] residence.

Payne was arrested and, as he was being taken to the patrol car, stated that Ratleff "didn't know that stuff was in there." Ratleff admitted to having committed parole violations by failing to inform the APA of her change of address and by using marijuana.[1]

Payne argued in his motion to suppress that the warrantless search violated his Fourth Amendment rights because Officer Niekamp lacked probable cause to believe Ratleff was living there at the time of the search. Payne also argued that the "parole search was merely a tool to gain entry and search Mr. Payne's home." The government maintained that the search was reasonable under *Knights*, and the district court agreed. Specifically, the district court found that "[t]he presence and additional motive of Detective Comstock during the search is irrelevant," and that, "[b]ecause Officer Niekamp had probable cause to believe that Ratleff was living at the Powers Street Residence, the search of that residence in her presence did not violate the Fourth Amendment."

Payne entered into a conditional plea agreement under Fed. R. Crim. P. 11(c)(1)(C), which provided for dismissal of the drug charges and an agreement as to his sentence for being a

---

[1]Clothing and mail belonging to Ratleff were also found in the residence.

felon in possession of a firearm.  Consistent with that agreement, defendant was sentenced to 60 months of imprisonment, to be followed by three years of supervised release.  This appeal followed.[2]

## II.

On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*.  *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004).  The defendant bears the burden to demonstrate "'a violation of some constitutional or statutory right justifying suppression.'"  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (citation omitted).  Also, because the district court denied the motion to suppress, we review the evidence in the light most favorable to the government.  *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009).

"A probationer's [or parolee's] home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'"  *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).  However, probationers, like parolees, "do not enjoy the 'absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'"  *Id*. at 874 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).  In fact, "the Supreme Court has made clear that the nature of the relationship between state actors and individuals subject to state supervision in lieu of or following release from prison alters the relevant analysis under the Fourth Amendment."  *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007).

The Supreme Court has identified two justifications under which a parole-authorized warrantless search may be found reasonable under the Fourth Amendment.  First, the Court in

---

[2]The district court accepted the agreement as to Payne's sentence, although with an offense level of 25 and criminal history category of III the advisory guidelines range for the firearm offense was 70 to 78 months.

*Griffin* recognized that a state's operation of a probation system "presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin*, 483 U.S. at 873-74. The Court upheld the search of a probationer's home pursuant to a state regulation that authorized a warrantless search when a probation officer had "reasonable grounds" to believe the probationer was in possession of contraband. *Id*. at 870-71. Then, in *Knights*, the Court recognized that a police officer's search of a probationer's home pursuant to a probation condition authorizing the search with or without a warrant or probable cause could be reasonable under the "totality of the circumstances." *United States v. Knights*, 534 U.S. 112, 118-19 (2001). If a warrantless search is reasonable under either *Knights* or *Griffin*, it need not pass muster under the other. *Herndon*, 501 F.3d at 688.[3]

Payne's principal contention is that the parole search was a ruse for the police investigation because the parole officer acted as a "stalking horse" for the police simply to evade the Fourth Amendment's warrant and probable-cause requirements. *See United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994). Because his motion to suppress asserted that the search was just such a ruse, albeit without explicitly referencing *Griffin* or the stalking-horse theory, we reject the government's claim that the argument was either waived or forfeited. *See United States v. Caldwell*, 518 F.3d 426, 430 (6th Cir. 2008).

Some courts, including this one, applied *Griffin*'s special-needs exception with the caveat that the parole officer could not be acting merely as a "stalking horse" for a police investigation. *Martin*, 25 F.3d at 296; *see also United States v. Watts*, 67 F.3d 790, 794 (9th Cir. 1995), *rev'd on other grounds*, 519 U.S. 148 (1997). This court in *Penson* questioned, but did not decide,

---

[3] The Court extended application of *Knights* to parolees, holding that a statute requiring parolees to submit to search or seizure with or without a warrant and with or without cause was reasonable under the totality of the circumstances. *Samson v. California*, 547 U.S. 843, 857 (2006); *see also United States v. Smith*, 526 F.3d 306, 309-10 (6th Cir. 2008) (upholding suspicionless search of defendant under community confinement).

whether the stalking-horse argument has continued validity after *Knights*.  *See United States v.*

*Penson*, 141 F. App'x 406, 410 n.2 (6th Cir. 2005).  More recently, this court suggested in dicta

that, although not relevant under *Knights*, an officer's motivations do still matter when the

government relies on *Griffin*'s special-needs exception to justify the search.  *See United States v.*

*Lykins*, 544 F. App'x 642, 648 n.2 (6th Cir. 2013).  We need not resolve this question because, as

in *Lykins*, the government did not rely on the special-needs doctrine to justify the search in this

case.  *Id.*[4]

        However, the stalking-horse argument has no application when, as here, a search may be

justified under *Knights*' totality-of-the-circumstances standard.  Any doubt is dispelled by

*Knights* itself:

> Because our holding rests on ordinary Fourth Amendment analysis that
> considers all the circumstances of a search, there is no basis for examining official
> purpose.  With the limited exception of some special needs and administrative
> search cases, *see Indianapolis v. Edmond*, 531 U.S. 32, 45 (2000), "we have been
> unwilling to entertain Fourth Amendment challenges based on the actual
> motivations of individual officers."  *Whren v United States*, 517 U.S. 806, 813
> (1996).

*Knights*, 534 U.S. at 122; *see also United States v. Williams*, 417 F.3d 373, 378 (3d Cir. 2005)

(citing cases holding that the stalking-horse theory does not survive *Knights*).  Thus, the district

court did not err by disregarding Payne's arguments about the motivation for the search in

denying his suppression motion.

        Defendant asserts that the warrantless search may not be justified under *Knights* because

that exception only applies when the search is based on suspicion of *new* criminal activity as

---

[4]This court explained in *Penson* that "it is wholly permissible for law enforcement officers and probation officers to 'work together and share information to achieve their objectives.'"  *Id.* at 410 (citation omitted).  This means "probation officers may properly request police assistance in executing their duties as probation officers."  *Id.*  "The only type of cooperation which the Fourth Amendment prohibits is the use of the probation system for investigatory purposes in order to permit law enforcement officers to evade the Fourth Amendment warrant requirement."  *Id.*; *see also United States v. Russ*, 23 F. App'x 245, 247 (6th Cir. 2001) (finding no evidence that probation officer was acting as "stalking horse" for police).

opposed to a violation of the conditions of parole or probation. However, this court explicitly

rejected this same argument in *Herndon*. Specifically, we held that

> the object of [the probation officer's] suspicion-Herndon's potential violation of
> the terms of his probation as opposed to a generally applicable criminal statute-
> does not impact the availability of the *Knights* framework. For the purposes of
> our Fourth Amendment inquiry here, a probationer's violation of the terms of
> probation is comparable to his violation of a criminal statute.

*Herndon*, 501 F.3d at 689. We added that "our sister circuits have consistently applied the

*Knights* regime to searches undertaken to investigate potential violations of probation or parole."

*Id*. (citing cases). Thus, we held that it was irrelevant for the purposes of the *Knights* analysis

whether the probation officer sought evidence of a probation violation or proof of a violation of a

generally applicable criminal statute. *Id*. at 690. Accordingly, we turn to the district court's

application of the *Knights* framework to this case.

Whether a search is reasonable under the totality of the circumstances "is determined by

assessing, on one hand, the degree to which it intrudes upon an individual's privacy and, on the

other, the degree to which it is needed for the promotion of legitimate governmental interests."

*Knights*, 534 U.S. at 118-19. "Just as other punishments for criminal convictions curtail an

offender's freedoms, a court granting probation may impose reasonable conditions that deprive

the offender of some freedoms enjoyed by law-abiding citizens." *Id.* at 119. The Court found

that it was reasonable to conclude that the search condition would further the goals of probation,

and imposition of the search condition "significantly diminished Knights' reasonable expectation

of privacy." *Id*. at 120. Balancing the reduced expectation of privacy and the governmental

interest in monitoring probationers, the Court held that reasonable suspicion was sufficient to

conduct a search of a probationer's house. *Id*. at 121.

Here, Ratleff was subject to Ohio Rev. Code § 2967.131(C), which authorized her parole officer to search her place of residence, with or without a warrant, if the officer had "reasonable grounds to believe that [she] has left the state, is not abiding by the law, or otherwise is not complying with the terms and conditions of [her] conditional pardon, parole, transitional control, other form of authorized release, or post-release control." There is no dispute that, as Ratleff acknowledged, she was required as a condition of supervision to advise her parole officer of any change of address from her mother's apartment. We have no difficulty concluding that Officer Niekamp had at least reasonable suspicion that Ratleff was not in compliance with that condition at the time of the search. The district court also required that there be probable cause to believe Ratleff was a resident of the premises to be searched, in reliance on *United States v. Bolivar*, 670 F.3d 1091, 1094-95 (9th Cir. 2012). The government does not argue that it was error to require probable cause to believe Ratleff resided at the premises to be searched. Because we agree that probable cause existed, it is not necessary to decide whether reasonable suspicion connecting a parolee or probationer to the premises to be searched would be sufficient under the balancing called for by *Knights*. *See, e.g.*, *United States v. Crutchfield*, 444 F. App'x 526, 528 (3d Cir. 2011) (declining to reach the issue because probable cause existed).[5]

Disputing that there was probable cause to believe Ratleff resided at the Powers Street Residence, Payne emphasized that Ratleff had not signed the handwritten addendum to the lease (although she had signed the lease itself) and that Ratleff did not affirmatively respond when confronted outside the Powers Street Residence (but merely started to cry). However, the

---

[5] The court in *Bolivar* adhered to its prior holding in *Motley* that "a condition of parole that permits warrantless searches provides officers with the limited authority to enter and search a house where the parolee resides even if others also reside there. But they have to be reasonably sure that they are at the *right* house." *Motley v. Parks*, 432 F.3d 1072, 1079 (9th Cir. 2005) (en banc) (involving § 1983 action by non-parolee who claimed there was not sufficient basis to believe the parolee lived with her). The court explained that requiring officers to have probable cause to believe they are at the parolee's residence protects the interests of third parties who also reside there. *Bolivar*, 670 F.3d at 1094-95.

information Officer Niekamp possessed at the time of the search included: (1) that he had been unsuccessful in confirming that Ratleff was residing at her mother's apartment; (2) that Ratleff had been observed coming and going from and driving cars associated with the Powers Street address; (3) that Ratleff had signed a lease with Payne for the Powers Street Residence when she was reportedly living with her mother; (4) that the owners of the Powers Street Residence said they were aware that Payne and Ratleff were living there together; and (5) that Ratleff did not deny that she was residing at the Powers Street Residence when confronted outside prior to the search. The district court did not err in finding that Officer Niekamp had probable cause to believe Ratleff was living at the Powers Street address in violation of the conditions of her post-release control at the time he entered to conduct the parole search. The search was reasonable under *Knights*, and the district court did not err in denying Payne's motion to suppress the evidence seized.

**AFFIRMED.**